1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11                           ----oo0oo----

12   REBECCA COBAIN, AMANDA
     SPITSEN, and AMELIA ESPINOZA
13                                          NO. CIV S-05-2248 FCD DAD
            Plaintiffs,
14
        v.                                  MEMORANDUM AND ORDER
15
     DESTINATION HOTELS & RESORTS,
16   and DOES 1 through 25,
     inclusive,
17
            Defendants.
18

19                           ----oo0oo----

20        This matter is before the court on defendant Destination

21   Tahoe Hotel, Inc.'s ("DTH")[1] motion for summary judgment pursuant

22   to Rule 56 of the Federal Rules of Civil Procedure.[2]  Plaintiffs

23   Amanda Spitsen ("Spitsen") and Amelia Espinoza ("Espinoza")

24   oppose the motion, and plaintiff Spitsen filed two separate

25   _____

26        [1]    Defendant asserts that plaintiffs erroneously sued
     Destination Hotels & Resorts ("DHR"), DTH's parent company, but
27   stipulated to the substitution of DTH in place of DHR as the
     proper defendant.
28
          [2]    All further references to a "Rule" are to the Federal
     Rules of Civil Procedure, unless otherwise noted.

cross-motions for partial summary judgment.  The court heard oral

argument on the motions on May 11, 2007.  For the reasons set

forth below, defendants' motion for summary judgment is GRANTED

in part and DENIED in part, and plaintiff Spitsen's cross-motions

for summary judgment are GRANTED in part and DENIED in part.[3]

### BACKGROUND[4]

Defendant DTH manages the Resort at Squaw Creek (the

"Resort"), located near Lake Tahoe, California.  (SDF ¶ 1).

Prior to April 6, 2004, Benchmark Hospitality ("Benchmark")

managed the Resort, pursuant to a management agreement with the

Resort's owners.  (Id.)  Plaintiff Spitsen worked for Benchmark

from 2002 until DTH took over the management of the Resort on

April 6, 2004. (DUF at 2, ¶ 1).  Plaintiff Espinoza worked for

DTH until she submitted her resignation on August 28, 2004.  (SDF

¶ 64).

/////

/////

---

[3]    On May 10, 2007, the parties filed a Notice of Partial
Settlement of the Case, informing the court that all claims
between plaintiff Rebecca Cobain and defendant DTH have been
settled.  (Notice, Docket # 71, filed May 10, 2007).  As such,
the court does not address the aspects of the parties' motions
relating to plaintiff Cobain's claims.

[4]    Unless otherwise noted, the facts recited herein are
undisputed.  (See Def.'s Reply to Pls.' Stmt. of Disputed
Material Facts ("SDF"), filed Apr. 6, 2007; Pl.'s Reply to Def.'s
Opp'n to Pls.' Separate Stmt. of Undisp. Facts ("DUF"), filed
Apr. 6, 2007).  Where the facts are disputed, the court recounts
plaintiffs' version of the facts.  (See SDF).

Both parties have filed objections to evidence.  Much of the
evidence objected to is immaterial to the court's analysis of the
summary judgment motion.  To the extent that the court relies
upon evidence subject to objection, those objections are ruled
upon herein.

### A.   Plaintiff Spitsen

On March 27, 2002, Benchmark hired plaintiff Spitsen as an administrative assistant in the sales and marketing department. (Decl. of Amanda Spitsen in Supp. of Pls.' Cross Mot. for Summ. J. ("Spitsen Decl."), filed Mar. 16, 2007, ¶ 2).  From May 18, 2002 through April 5, 2004, Spitsen was employed as a Marketing Manager at the Resort.  (SDF ¶ 2).  Before DTH took over management of the Resort, Steve Tremewan ("Tremewan") was the Director of Sales & Marketing, Spitsen was the Marketing Manager, and Kristin Krieger ("Krieger") was the Sales & Marketing Administrative Assistant. (SDF ¶ 32).  On April 6, 2004, DTH replaced Benchmark as the manager of the Resort.  (SDF ¶ 3). However, before DTH took over the management of the Resort, it had a "Shadow Management Team" (also referred to as the "Transition Team") in place that managed the Resort through the initial transition.  (DUF at 3, ¶ 6).  The Transition Team, comprised of executives from DTH's parent company, assessed the Resort's needs, including meeting with Benchmark's managers and directors.  (SDF ¶ 4).  Plaintiffs contend that the Transition Team was running the Resort prior to April 6, 2004, including engaging in activities such as signing off on promotions of Benchmark employees.  (SDF ¶ 13).

On around January 26, 2004, Spitsen began her previously approved maternity leave.  (Spitsen Decl. ¶ 4; DUF at 36, ¶ 8). She expected to return from her leave on August 23, 2004.  (Id. ¶ 5; DUF at 36, ¶ 9).  However, because Benchmark was leaving the Resort, it terminated all of its Resort employees effective April 5, 2004, after giving them all notice that the transition was

occurring and that they could apply for employment with DTH if they desired.  (Decl. of John Spomer in Supp. of Def.'s Mot. for Summ. J. ("Spomer Decl."), filed Mar. 16, 2007, ¶ 6). Benchmark's managerial employees were required to submit applications, consent to background checks, and meet with members of the Transition Team before being offered employment with DTH. (Id. ¶ 8).

In or about February 2004, Spitsen applied for a position as the Marketing Manager for DTH when it took over the management of the Resort on April 6, 2004.  (SDF ¶ 15).  DTH did not employ Sptisen in any capacity after April 6, 2004.  (SDF ¶ 15). Rather, on March 11, 2004, Spitsen was informed that her subordinate, Krieger, was going to be promoted to the position of Marketing Coordinator, a promotion that Spitsen stated Krieger deserved.  (SDF ¶¶ 33-34).  Prior to taking over management of the Resort, DTH concluded that there was no need to have a Marketing Manager if it had a Director of Sales & Marketing and a Marketing Manager.  (SDF ¶ 36).  Defendant contends that the Marketing Coordinator position was created because there was no need for a Marketing Manager and the new position would provide support to sales managers that no existing position was yet providing.  (SDF ¶ 38).  Plaintiff asserts that, in reality, Krieger performed the same functions that Spitsen performed as Marketing Manager.  (SDF ¶ 38).  DTH did not hire a Marketing Manager in April 2004.  (SDF ¶ 39).

Spitsen claims that she subsequently applied for a position as Marketing Coordinator with DTH in March 2006.  (SDF ¶ 40). DTH did not hire her.  (SDF ¶ 17).

4

### B.    Plaintiff Espinoza

In or about July 2004, while plaintiff Espinoza was on a pregnancy-related leave of absence from her position with DTH, DTH's General Manager, Stan Kantowski ("Kantowski"), eliminated the entire Amenities Reservations Department, where Espinoza worked as an Amenities Reservations Agent.  (SDF ¶ 45).  The department was eliminated because Kantowski believed that: (1) the functions of the Amenities Reservations Agents could be performed by Room Reservation Agents, who were employed in a different department; and (2) by eliminating the department and transferring the duties to the Room Reservations Department, the Resort would operate more efficiently.  (SDF ¶ 45).  Plaintiffs contend that DTH made certain that all employees of the department, except Espinoza, found other comparable positions. (SDF ¶ 45).

As a result of the elimination of the department, in or about July 2004, Espinoza was informed that her position as an Amenities Reservation Agent was being eliminated and the she would need to identify a position to transfer to.  (SDF ¶ 46). Before she returned from her leave, Espinoza first spoke to her former supervisor in the Amenities Reservations Department, Mary McCormick to see if there were openings in the PBX department, but there were none.  (SDF ¶ 48).  Espinoza also spoke to the manger of the Room Reservations Department, Heidi Schneider, to inquire about a position as a Room Reservations Agent.  (SDF ¶ 49).  This position is comparable to the Amenities Reservation Agent position in terms of compensation and duties.  (SDF ¶ 53). There were no openings for the early shifts, beginning at 6:30

a.m., 8:00 a.m., or 8:30 a.m., as those shifts were already staffed with employees who had held the positions for more than a year before Espinoza went out on leave.  (SDF ¶ 50).  The open position was for one of the later shifts, the earliest of which began at 10:30 a.m. and ended at 7:00 p.m., which plaintiff explained would interfere with her childcare needs.  (SDF ¶ 50). Plaintiffs assert that the later shifts rotated such that she would have to work shifts that began at 1:30 p.m. and 2:30 p.m. and did not end until 10:00 p.m.  (SDF ¶ 50).  Plaintiff contends that as such, this was not a comparable position.  (SDF ¶¶ 50-51).

Espinoza also spoke to the Manager of the Resort Spa about a position in that department.  (SDF ¶ 54).  Plaintiff asserts that she saw the Spa Host position posted, but when she went to speak to the supervisor, she was told that they were looking for a man that can lift about fifty pounds.  (SDF ¶¶ 55-56).  Defendant asserts that there were no openings for the Spa Host position during June, July, and August of 2004, and that there was a position open for Spa Attendant – Male during the time period that plaintiff was looking for a position.  (SDF ¶ 58).  The Spa Attendant – Male position requires a man that can lift fifty pounds because the Attendant must service the Men's locker room during times when the locker room is being used.  (SDF ¶ 57).

Espinoza met with DTH's Director of Human Resources, Julie Horn, and then went to a bulletin board outside Horn's office identifying every open position at the Resort.  (SDF ¶ 59). Espinoza also met with DTH's Employment Manager, Gina Calderon, and was informed about how to find a new position.  (SDF ¶ 60).

1  Plaintiff ultimately selected a new position in the retail
2  department, where she began working on August 11, 2004. (SDF ¶
3  62).  She contends that she only took this position because she
4  was not allowed to work as a Spa Host. (SDF ¶ 62).  On August
5  28, 2004, Espinoza submitted her "Voluntary Resignation," which
6  indicated that she was resigning from DTH for "personal reasons."
7  (SDF ¶ 64).  Her last day was shortly thereafter. (SDF ¶ 64).

8  **STANDARD**

9  Summary judgment is appropriate when it is demonstrated that
10 there exists no genuine issue as to any material fact, and that
11 the moving party is entitled to judgment as a matter of law.
12 Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144,
13 157 (1970).

14 Under summary judgment practice, the moving party

15   always bears the initial responsibility of informing
16   the district court of the basis of its motion, and
     identifying those portions of "the pleadings,
     depositions, answers to interrogatories, and admissions
17   on file together with the affidavits, if any," which it
     believes demonstrate the absence of a genuine issue of
18   material fact.

19 <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the
20 nonmoving party will bear the burden of proof at trial on a
21 dispositive issue, a summary judgment motion may properly be made
22 in reliance solely on the 'pleadings, depositions, answers to
23 interrogatories, and admissions on file.'"   <u>Id.</u> at 324.  Indeed,
24 summary judgment should be entered against a party who fails to
25 make a showing sufficient to establish the existence of an
26 element essential to that party's case, and on which that party
27 will bear the burden of proof at trial.   <u>Id.</u> at 322.  In such a
28 circumstance, summary judgment should be granted, "so long as

7

whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, id. at 251-52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 289. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

8

1  <u>Matsushita</u>, 475 U.S. at 587 (quoting Rule 56(e) advisory

2  committee's note on 1963 amendments).

3      In resolving the summary judgment motion, the court examines

4  the pleadings, depositions, answers to interrogatories, and

5  admissions on file, together with the affidavits, if any.  Rule

6  56(c); <u>SEC v. Seaboard Corp.</u>, 677 F.2d 1301, 1305-06 (9th Cir.

7  1982).  The evidence of the opposing party is to be believed, and

8  all reasonable inferences that may be drawn from the facts placed

9  before the court must be drawn in favor of the opposing party.

10 <u>Anderson</u>, 477 U.S. at 255.  Nevertheless, inferences are not

11 drawn out of the air, and it is the opposing party's obligation

12 to produce a factual predicate from which the inference may be

13 drawn.  <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224,

14 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898 (9th Cir. 1987).

15     Finally, to demonstrate a genuine issue, the opposing party

16 "must do more than simply show that there is some metaphysical

17 doubt as to the material facts. . . . Where the record taken as a

18 whole could not lead a rational trier of fact to find for the

19 nonmoving party, there is no 'genuine issue for trial.'"

20 <u>Matsushita</u>, 475 U.S. at 586-87, 106 S. Ct. at 1356.

21                            **ANALYSIS**

22 **A.   Fair Employment and Housing Act Claims**

23     Plaintiffs bring claims under the Fair Employment and

24 Housing Act ("FEHA") for wrongful termination, retaliation, and

25 failure to hire on the basis of gender and pregnancy.  Defendant

26 moves for summary judgment on the ground that plaintiffs have not

27 produced sufficient evidence to create a triable issue of fact

28 for violations of FEHA.

1    FEHA provides that it is "an unlawful employment practice"

2   for an employer to refuse to hire or employ, to bar or discharge

3   from employment, or to discriminate against any individual in

4   compensation or in terms, conditions, or privileges of employment

5   on the basis of sex.  Cal. Gov. Code §§ 12940 (West 2007).  FEHA

6   also provides that it is "an unlawful employment practice" "for

7   an employer to refuse to allow a female employee to take a leave

8   for a reasonable period of time not to exceed four months and

9   thereafter return to work."  Cal. Gov. Code § 12945 (West 2007).

10  "Although the wording of the Fair Employment Housing Act and

11  Title VII of the Federal Civil Rights Act of 1964 differs in some

12  particulars, the antidiscriminatory objectives and the overriding

13  public policy purposes are identical," and therefore, California

14  courts refer to applicable federal decisions where appropriate.

15  Sorosky v. Burroughs Corp., 826 F.2d 794, 803 (9th Cir. 1987)

16  (citing County of Alameda v. Fair Employment & Hous. Comm'n, 153

17  Cal. App. 3d 499, 504 (1984); Guz v. Bechtel Nat'l, Inc., 24 Cal.

18  4th 317, 354 (2000)).  California courts apply the McDonnell

19  Douglas burden shifting approach to claims brought pursuant to

20  FEHA and apply the same guiding legal principles.  See Brooks v.

21  City of San Mateo, 229 F.3d 917, 923 (9th Cir. 2000) (citing

22  Beyda v. City of Los Angeles, 65 Cal. App. 4th 511, 517 (1998);

23  Okoli v. Lockheed Tech. Operations Co., 36 Cal. App. 4th 1607,

24  1614 n.3 (1995)).

25    To establish a case of discrimination on the basis of sex or

26  pregnancy in violation of FEHA, plaintiff must prove (1) she was

27  a member of a protected class; (2) she was performing competently

28  in the position she held; (3) she suffered an adverse employment

10

action, such as termination, demotion, or denial of an available job; and (4) some other circumstance suggests discriminatory motive. <u>Guz</u>, 24 Cal. 4th at 355 (citations omitted). Under <u>McDonnell Douglas</u>, once the plaintiff makes out a prima facie case of discrimination, the burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for the adverse action. <u>Id.</u> at 355-56. However, only the burden of production shifts; the ultimate burden of persuasion remains with the plaintiff. <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981). If the defendant can make this showing, the burden shifts back to the plaintiff to "attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." <u>Guz</u>, 24 Cal. 4th at 356 (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515-18 (1993)).

### 1.   Defendant as "Employer"

Defendant argues that plaintiff Spitsen's FEHA claims for wrongful termination and retaliation must fail because DTH was not her employer. Defendant contends that Spitsen was a Benchmark employee and Benchmark terminated her employment on April 5, 2004, prior to DTH's transition into management of the Resort.

FEHA prohibits only "an employer" from engaging in improper discrimination. Cal. Gov. Code § 12940; <u>Vernon v. State</u>, 116 Cal. App. 4th 114, 123 (2004). "The fundamental foundation for liability is the existence of an *employment* relationship between the one who discriminates against another and that other who

11

finds himself the victim of that discrimination." Id. (internal

quotations omitted).

### a.   Joint Employer

Plaintiff Spitsen contends that DTH was a joint employer

during the period of Shadow Management at the Resort, and

therefore, liable for her alleged wrongful termination.

California courts have held that dual or joint employers may

exist for the purposes of FEHA when "both [employers] have the

right to exercise certain powers of control over the employee."

Mathieu v. Norrell Corp., 115 Cal. App. 4th 1174, 1183 (2004)

(quoting Kowalksi v. Shell Oil Co., 23 Cal. 3d 168, 174 (1979)).

The key principle in evaluating whether a defendant is an

employer is that the court must look at the totality of the

circumstances, "with emphasis upon the extent to which the

defendant controls the plaintiff's performance of employment

duties." Vernon, 116 Cal. App. 4th at 124.  In viewing the

totality of the circumstances, the court may also look to factors

such as: (1) the nature and degree of control over employees; (2)

the day-to-day supervision of employees, including discipline;

(3) the authority to hire and fire employees and set conditions

of employment; (4) the power to set conditions of employment; and

(5) control of employee records, including payroll.  See Jones v.

County of Los Angeles, 99 Cal. App. 4th 1039, 1045-46 (2002); see

also Torres-Lopez v. May, 111 F.3d 633, 639-40 (9th Cir. 1997).

No one factor is decisive, and "the precise contours of an

employment relationship can only be established by a careful

factual inquiry." Vernon, 116 Cal. App. 4th at 125 (quoting

Graves v. Lowery, 117 F.3d 723, 729 (3d Cir. 1997)).

However, "the extent of the defendant's right to control the means and manner of the worker's performance is the most important." Id. (citations omitted).  This inquiry "considers the level of control an organization asserts over an individual's access to employment opportunities." Id.  "Further, the control an organization asserts must be significant, and there must be sufficient indicia of an interrelationship to justify the belief on the part of an aggrieved employee that the alleged co-employer is jointly responsible for the acts of the immediate employer." Id. (internal citations and quotations omitted).

Spitsen asserts that DTH exercised control over employees, and thus, that there are triable issues of fact regarding whether DTH was a dual employer with Benchmark.  In support of this contention, plaintiff presents evidence that Thomas Luerson, a member of the Transition Team, testified at his deposition that there was a manager from DTH on site that worked with Benchmark in managing the facility.  (Dep. of Thomas P. Luerson ("Luerson Dep."), Ex. B to Decl. of Thomas E. Duckworth in Supp. of Pls.' Opp'n ("Duckworth Opp'n Decl."), filed Mar. 30, 2007, at 76:20-23).  Plaintiff also presents evidence that from January 2004 to the transition on April 6, 2004, Julie Horn, the Human Resources Director at the Resort, thought that her supervisor was Gordon MacMitchell, the Shadow Manager for DTH.  (Dep. of Julie Horn ("Horn Dep."), Ex. C. To Duckworth Opp'n Decl., at 46:3-19).  Further, plaintiff presents evidence that David Renker, a member of the Transition Team, signed the document reflecting that Krieger was being promoted from Marketing Assistant to Marketing

13

Coordinator.  (Dep. of David Renker ("Renker Dep."), Ex. E to Duckworth Opp'n Decl., at 27:9-28:12; Ex. 1 to Renker Dep.).

Defendant asserts that the Transition Team was assigned to observe the operations of the Resort while it was still under Benchmark's management and to perform due diligence in preparation of DTH's future management of the Resort.  Defendant argues that plaintiff's purported evidence does not suggest that DTH did anything more than observe and perform due diligence.  In support of this contention, DTH points to its Management Agreement for the Resort at Squaw Creek, which provides that DTH "shall have the right and authority to act on behalf of Owner and as Owner's representative" under the Benchmark Agreement and "shall coordinate with Benchmark on behalf of Owner" to effect a smooth transition in management.  (Management Agreement, Ex. 1 to Decl. of James T. Jones ("Jones Decl"), filed Apr. 6, 2007).  The Management Agreement also provides that DTH "shall not be deemed to have assumed management responsibilities of the Hotel prior to the Commencement Date by virtue of such shadow management."  (Id.)

While plaintiff Spitsen's proffered evidence may touch on some of the factors relevant to the joint employer inquiry, such evidence fails to demonstrate that DTH exercised "significant control" over Benchmark employees prior to the management transition.  See Vernon, 116 Cal. App. 4th at 125 (holding that the defendant was not a joint employer for purposes of FEHA where it had not hired the plaintiff, set his compensation, maintained personnel records for him, or trained him); see also Mendoza v. Town of Ross, 128 Cal. App. 4th 625 (2005) (holding that the

defendant was not an employer under FEHA where it had not hired
the plaintiff nor provided any remuneration for his services).
Nor does such evidence provide "sufficient indicia of an
interrelationship to justify the belief" of plaintiffs that DTH
is jointly responsible for the acts of the immediate employer,
Benchmark.  See id.; see also Jones, 99 Cal. App. 4th 1039, 1046-
47 (holding that there was "insufficient indicia" where the
defendant paid the plaintiff's salary and benefits, but where the
true employer had the exclusive right to control the duties of
the employees).  Therefore, no triable issues of fact exist
regarding whether defendant can be held liable as a "joint
employer" under FEHA.

### b.   Successor Employer

Plaintiff Spitsen also argues that defendant should be held
liable as an "employer" under FEHA because it was a "successor
employer" to Benchmark.[5]  The successor liability doctrine is
based upon the principle that "[i]n certain circumstances a new
employer will be held liable for the legal obligations of its
predecessor employer though explicit assumption of the
obligations is absent."  Bates v. Pacific Maritime Ass'n, 744
F.2d 705, 708 (9th Cir. 1984).  This theory of liability is an
equitable doctrine and "is applied only when necessary to further
some fundamental policy in regulation of the industry or work

---

[5]   Plaintiff Spitsen moved for partial summary judgment on
the issue of whether defendant was a "successor in interest" for
purposes of the Family Medical Leave Act ("FMLA") and the
California Family Rights Act ("CFRA"), and plaintiff references
her cross-motions in her opposition to defendant's motion for
summary judgment in relation to her FEHA claims.  As such, the
court considers the merits of the arguments raised in plaintiff's
cross-motions in its analysis of this issue.

1  place affected." Id.; see Baker v. Delta Air Lines, 6 F.3d 632,

2  637 (9th Cir. 1993).  The Ninth Circuit has held the

3  successorship doctrine to apply to Title VII obligations.  Bates,

4  744 F.2d at 708; Slack v. Havens, 522 F.2d 1091, 1094-95 (9th

5  Cir. 1975), reversed on other grounds.  While the parties fail to

6  cite any cases where California courts or the Ninth Circuit has

7  applied successor liability under FEHA, California courts have as

8  a general rule looked to federal decisions under Title VII for

9  assistance in interpreting FEHA.  Page v. Superior Court, 31 Cal.

10 App. 4th 1206, 1215 (1995).  Further, defendant has raised no

11 opposition to the applicability of successor liability to claims

12 under FEHA, generally, but rather, objects to the application of

13 this doctrine under the facts of this case.

14      Assuming *arguendo* that the doctrine of successor liability

15 applies to claims brought pursuant to FEHA, it is inapplicable in

16 this case.  In the context of employment discrimination cases,

17 successor liability attaches in order to hold the successor

18 employer liable for the discriminatory acts of the predecessor

19 employer.  See Baker v. Delta Air Lines, Inc., 6 F.3d 632 (9th

20 Cir. 1993) (finding that successor liability applied and company

21 was bound by injunction issued against predecessor company prior

22 to acquisition by the successor); Criswell v. Delta Air Lines,

23 Inc., 868 F.2d 1093 (9th Cir. 1989) (same); Bates, 744 F.2d 705

24 (holding that successor employer was bound to Title VII consent

25 decree entered into by predecessor employer); Slack, 522 F.2d

26 1091 (holding that successor liability applied where defendant

27 employer was incorporated after the discriminatory termination);

28 Sandoval v. Saticoy Lemon Ass'n, 747 F. Supp. 1373 (C.D. Cal.

16

1990) (holding that successor liability applies where plaintiffs
asserted that the predecessor employer discriminated against them
and the successor employer continued to discriminate after the
merger).  In all employment discrimination cases cited by
plaintiff and those found by this court, the predecessor company
was the party alleged to have committed the discriminatory act at
issue.  In this case, Benchmark was the predecessor employer.  It
is undisputed that Benchmark terminated all of its approximately
600 employees at the Resort effective April 5, 2004, after
notifying all of its employees, in writing, on February 2, 2004.
(DUF at 23, ¶ 21).  Plaintiff Spitsen did not allege in her
complaint, nor argue in her briefing, that *Benchmark* terminated
or retaliated against her on the basis of gender or pregnancy.
Rather, the crux of plaintiff Spitsen's claim is that defendant
*DTH* unlawfully discriminated against her by failing to employ her
when it took over management of the Resort on April 6, 2004.
Because plaintiff is not seeking to impose liability upon DTH for
employment discrimination by Benchmark, successor liability does
not apply to plaintiffs Spitsen's FEHA claims.

Further, successor liability is an equitable doctrine, the
application of which requires "a balancing of the purposes of
[employment discrimination statutes] with the legitimate and
often conflicting interests of the employer and the
discriminatee."  Bates, 744 F.2d at 709.  In this case, equity
does not require successor liability to attach.  The employer
which plaintiff Spitsen alleges discriminated against her,
defendant DTH, may be liable under a theory that it unlawfully
failed to hire her on the basis of sex or pregnancy.  As such,

the rights of the alleged discriminatee are protected and the purposes of FEHA are served.[6]

Because defendant DTH was neither a "joint employer" when Spitsen was terminated nor a "successor employer" for purposes of FEHA, plaintiff Spitsen's claims for termination and retaliation in violation of FEHA fail because defendant DTH did not terminate her employment. Therefore, defendant's motion for summary judgment regarding plaintiff Spitsen's FEHA claims based upon discriminatory termination and retaliation is GRANTED.  For the same reasons, plaintiff Spitsen's corollary claim for termination in violation of public policy likewise fails, and defendant's motion for summary judgment is GRANTED.[7]

### 2.   Failure to Hire Plaintiff Spitsen

#### a.   April 2004

Plaintiff Spitsen alleges that defendant DTH failed to hire her when it took over management of the Resort from Benchmark, on the basis of her sex and pregnancy in violation of FEHA.

---

[6]    However, the court notes that the applicability of successor liability in regards to plaintiff's employment discrimination case provides a different set of circumstances than those relating to her argument that DTH was a successor in interest for the purposes of her FMLA and CFRA claims.  The applicability of the doctrine as applied to those claims is addressed *infra*.

[7]    To prove wrongful discharge in violation of public policy, a plaintiff must prove (1) an employer-employee relationship; (2) the termination of plaintiff's employment was a violation of public policy; (3) the termination was a legal cause of plaintiff's damage; and (4) the nature and extent of plaintiff's damage.  Holmes v. Gen. Dynamics Corp., 17 Cal. App. 4th 1418, 1427 n.8 (1993).  In this case, as set forth above, plaintiff Spitsen has not established that defendant DTH was her employer or that it terminated her employment.  Plaintiff Spitsen's claims under FEHA, the FMLA, and the CFRA are all premised upon defendant's failure to employ her.

Defendant does not argue that plaintiff has failed to allege a prima facie case, but rather, that Spitsen was not hired for legitimate, non-discriminatory reasons.  Specifically, defendant contends that plaintiff's previous position as Marketing Manager no longer existed.

Defendant presents evidence that on March 11, 2004, before DTH began managing the Resort, Spitsen was informed that her subordinate, Krieger, was going to be promoted to the position of Marketing Coordinator.  (SDF ¶ 33).  At the time, Spitsen stated that Krieger deserved the promotion, and believed that Krieger's promotion was to a position that was above what she had previously performed but lower than marketing manager.  (SDF ¶¶ 34-35; Dep. of Amanda Spitsen ("Spitsen Dep."), Ex. O to Duckworth Opp'n Decl., at 285:15-22).  Defendant also presents evidence that the Transition Team, headed by John Spomer ("Spomer"), discussed information that had been gathered from Benchmark's Director of Sales and Marketing, Tremewan, which revealed that there was no need to hire for all the existing marketing positions because the marketing function could be properly performed with fewer employees than Benchmark had on staff.[8]  (Spomer Decl. ¶ 12).  Tremewan also informed Spomer that he was not sure that the marketing function at Benchmark had been "structurally optimized."  (Id.)  Therefore, the Transition Team concluded that under DTH management, the marketing function would

---

[8]     Plaintiffs object to the portions of John Spomer's declaration relating to this matter on the grounds that it contradicts testimony given in his deposition.  The court has reviewed both the declaration and the cited deposition testimony, and the statements are not contradictory.  As such, plaintiffs' objection is OVERRULED.

1  be carried out by the Director of Sales and Marketing and the
2  Marketing Coordinator, but not by a Marketing Manager.  (<u>Id.</u>)
3  Accordingly, Spitsen, who occupied the Marketing Manager position
4  at Benchmark and applied for that same position with DTH, was not
5  offered employment.  (<u>Id.</u> ¶ 13).

6      Even if this evidence is sufficient to support a legitimate,
7  non-discriminatory reason for defendant's conduct, i.e. that the
8  position plaintiff Spitsen applied for no longer existed,
9  plaintiff Spitsen contends that she has presented sufficient
10  evidence of pretext to create a triable issue of fact.  At the
11  summary judgment stage, plaintiff's burden is not high.
12  <u>Pottenger v. Potlatch Corp.</u>, 329 F.3d 740, 746 (9th Cir. 2003).
13  "[S]he must only show that a rational trier of fact could, on all
14  the evidence, find that [defendant's] explanation was pretextual
15  and that therefore [the] action was taken for impermissibly
16  discriminatory reasons."  <u>Id.</u>  However, the factual inquiry
17  regarding pretext requires a new level of specificity not present
18  in plaintiff's burden of setting forth a prima facie case.  <u>Texas</u>
19  <u>Dep't. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255 (1981).
20  Plaintiff must produce *specific* and *substantial* evidence that the
21  defendant's reasons are really a pretext for discrimination.
22  <u>Aragon v. Republic Silver State Disposal, Inc.</u>, 292 F.3d 654, 661
23  (9th Cir. 2002).

24      Plaintiff argues that defendant's restructuring of the
25  marketing department was merely a pretext for its failure to hire
26  her based on her gender and pregnancy.  In cases where similar
27  arguments were raised by the plaintiffs, California courts have
28  held that

1  downsizing alone is not necessarily a sufficient
explanation, under the FEHA, for the consequent
2  dismissal of a worker.  An employer's freedom to
consolidate or reduce its work force, and to eliminate
3  positions in the process, does not mean it may use the
occasion as a convenient opportunity to get rid of
4  workers.  Invocation of a right to downsize does not
resolve whether the employer had a discriminatory
5  motive for cutting back its work force, *or engaged in
intentional discrimination when deciding which*
6  *individual workers to retain and release*.

7  Kelly v. Stamps.com Inc., 135 Cal. App. 4th 1088, 1098 (2006)

8  (quoting Guz, 24 Cal. 4th at 358) (internal citations and

9  quotations omitted) (emphasis in original).

10      Plaintiff adduces evidence of a number of circumstances that

11 cast doubt on the genuineness of defendant's explanation for its

12 failure to hire her.  Plaintiff presents evidence that DTH failed

13 to hire only three manager-level employees of Benchmark in March

14 2004.[9]  (Def.'s Supp. Responses to Pl. Spitsen's First Set of

15 Special Interrogatories, Ex. G to Decl. of Thomas E. Duckworth in

16 Supp. Of Pl.'s 2d Cross Motion for Summ. J. ("Duckworth 2d

17 Decl."), filed Mar. 16, 2007, at 3).  These individuals were

18 Amanda Spitsen, Rebecca Cobain, and Jill Winberg.  Both Spitsen

19 and Cobain were on pregnancy leave during the time of the

20 management transition from Benchmark to DTH, (DUF at 35-36, ¶¶ 7-

21 10), while Jill Winberg had resigned from Benchmark before DTH

22 sent out offer letters to the other managers.  (DUF at 5, ¶ 10).

23 As such, the two manager-level employees who had not resigned

24

25      [9]   Defendant contends that this evidence is misleading
because other managers above "manager-level" were not hired,
26 including the General Manager of the Resort.  However, this fact
does not defeat the relevance of plaintiff Spitsen's evidence,
27 which tends to demonstrate that Benchmark employees at her
management level may have been treated differently amongst
28 themselves, based upon their pregnancy status.

from Benchmark and who were not hired by defendant were both on pregnancy-related leave.  Krieger, who was not on pregnancy-related leave at the time of the management transition to DTH, was retained in the marketing department.  (See DUF at 30, ¶¶ 52, 55).  As Marketing Coordinator, Krieger had some of the non-managerial responsibilities that overlapped with those of the eliminated Marketing Manager position.  (SDF ¶ 38).  Plaintiff also presents evidence that based upon a review of her performance from November to mid-January 2004, Tremewan thought that Spitsen was a solid performer, without any weaknesses. (Dep. of Steve Tremewan ("Tremewan Dep."), Ex. G to Duckworth Opp'n Decl., at 13:14-25).[10]

---

[10]    Plaintiff also presents evidence that Tremewan made statements to Spitsen regarding her pregnancy leave *prior to* DTH's assumption of management at the Resort.  While such statements are not dispositive to plaintiff's case because Tremewan was *not* a DTH employee at the time they were made, they are further evidence that could give rise to an inference of defendant's discriminatory motive in not hiring plaintiff Spitsen.  Specifically, according to plaintiff, Tremewan commented upon the length of her leave and told plaintiff that "it will be harder to get your job back if you're gone that long."  (Spitsen Dep. at 255:13-256:10).  Tremewan also stated that "[i]f Kristin [Krieger] does a great job, I may not want you back, either" and that "[i]f they ask when you're coming back and I tell them August, it doesn't look very good for you."  (Id. at 260:16-19; 262:8-11).

   At the time these statements were made, DTH had not assumed management of the Resort.  As such, the court does *not* attribute these statements to defendant DTH.  However, DTH's Transition Team spoke to Tremewan in the course of making their employment decisions.  (Spomer Decl. ¶ 12). Moreover, at least one member of the Transition Team, David Renker, testified that Tremewan told him that he had difficulty with Spitsen at times.  (Renker Dep. 23:16-24:7).  Therefore, in light of the prior statements made by Tremewan and the role that he played in giving the Transition Team information regarding the Resort's marketing department, this is evidence that a trier of fact could consider in assessing defendant's motive in not employing plaintiff Spitsen.

1    Based upon the foregoing analysis, "liberally construing

2    [plaintiff's] evidence [and] strictly scrutinizing defendant's,"

3    see Kelly, 135 Cal. App. 4th at 1098, plaintiff Spitsen has

4    proffered sufficient evidence from which a trier of fact could

5    find by a preponderance of evidence that intentional

6    discrimination occurred.  Id. (finding that the plaintiff had

7    proffered sufficient evidence that the elimination of her

8    position was mere pretext where she had previously been given

9    positive performance reviews, her former supervisor had made

10   negative comments that could have been directed to her pregnancy

11   leave, the employer offered shifting reasons for her termination,

12   and an individual who was not pregnant assumed the plaintiff's

13   duties); Warren v. City of Carlsbad, 58 F.3d 439, 443-44 (9th

14   Cir. 1995) (finding sufficient evidence of pretext where only two

15   men of color worked in the department, they occupied the lowest

16   ranking positions, and the plaintiff heard his supervisor make a

17   derogatory comment about Hispanics); see also Lindsey v. SLT Los

18   Angeles, LLC, 447 F.3d 1138, 1152-53 (9th Cir. 2006)

19   (acknowledging that direct evidence of discriminatory intent is

20   not required and finding sufficient evidence of pretext where the

21   defendant gave emphasis to certain documents that favored the

22   non-African-American group, while ignoring documents that favored

23   the African-American group).  As such, defendant's motion for

24   summary judgment regarding plaintiff Spitsen's claim that

25   defendant failed to hire her in April 2004 is DENIED.

26           **b.   March 2006**

27   Plaintiff Spitsen also alleges that defendant DTH failed to

28   hire her for the Marketing Coordinator position when it became

23

available in March 2006.  Defendant does not argue that plaintiff
has failed to set forth a prima facie case, but rather, asserts
that it had a legitimate, non-discriminatory reason for not
hiring plaintiff in March 2006 because DTH was not aware that she
applied for the position.  In support of this contention,
defendant offers the supplemental declaration of Daphne Haugh,
the Director of Human Resources at the Resort since September 11,
2006.[11]  (Supp. Decl. of Daphne Haugh in Supp. of Def.'s Mot. for
Summ. J. ("Supp. Haugh Decl."), filed May 18, 2007).  Haugh
asserts that as part of her job responsibilities, she maintains
records of the hiring process for prospective employees at the
Resort.  (Id. ¶ 2); see Butler v. IMA Regiomontana S.A., 210 F.3d
381 (9th Cir. 2000); Washington Cent. R.R. Co. v. Nat'l Mediation
Bd., 830 F. Supp. 1343, 1353 (E.D. Wash. 1993) (holding that
personal knowledge required for summary judgment affidavit may
come from review of files and records) (citing Londrigan v. FBI,
670 F.2d 1164, 1174-75 (D.C. Cir. 1981) and Vote v. United
States, 753 F. Supp. 866, 868 (D. Nev. 1990), aff'd, 930 F.2d 31
(9th Cir. 1991)).  Haugh also asserts that she is familiar with
the Resort's record keeping practice from April 6, 2004 to the
present, and that records of applications received are routinely
made and kept in the regular course of business.  (Id.)  Such
records are created near or at the time of receipt.  (Id.)  A

---

[11]     Defendant originally offered the declaration of
Stanislaw Kantowski, the General Manager of the Resort since
April 4, 2004, which provided that he inquired with the DTH Human
Resources Department, and no one has been able to find any record
of such a cover letter or resume.  Such evidence was rife with
admissibility problems.  However, at oral argument the court
allowed defendant an opportunity to offer admissible evidence and
gave plaintiff the opportunity to respond.

review of the records reveal that the Resort has no record of a
resume or job application from plaintiff Spitsen for any position
for the entire year of 2006.  (Id. ¶ 3).  As such, defendant has
proffered evidence that it failed to hire plaintiff in March 2006
because it never received her resume.

Plaintiff argues that Haugh's declaration is inadmissible
because she relies on inadmissible hearsay evidence.  However,
Rule 803(7) of the Federal Rules of Evidence provides that the
absence of a record kept in the course of a regularly conducted
business activity is not excluded by the hearsay rule and is
admissible to prove the nonoccurrence or nonexistence of the
matter.  Fed. R. Evidence 803(7) (West 2007).  Plaintiff argues
that the this evidence lacks trustworthiness because the record
keeping process may not be accurate.  In support of this
contention, she offers anecdotal evidence that in the course of
hiring an employee at the Resort in 2002, she did not return the
original resume of an applicant to Human Resources.  (Supp. Decl.
of Amanda Spitsen in Opp'n to Def.'s Mot. for Summary Judgment
("Supp. Spitsen Decl."), filed May 25, 2007, ¶ 2).  Such
anecdotal evidence is insufficient to raise an issue as to the
trustworthiness of defendant's record keeping procedures.  As an
initial matter, Haugh's declaration refers to the record keeping
process at the Resort from April 6, 2004 to the present.  (Supp.
Haugh Decl. ¶ 2).  Therefore, plaintiff Spitsen's belief
regarding how her actions would impact the records kept in Human
Resources in 2002 is irrelevant.  Moreover, plaintiff's anecdotal
evidence presupposes that the Resort uses only one copy, the
original, of an applicant's resume and/or application in the

25

hiring process.   Further, there is no evidence that plaintiff has
any personal knowledge of how defendant records and maintains its
records that would bear on the trustworthiness of such process.
Therefore, plaintiff's attempt to discredit defendant's evidence
fails.

Because defendant has presented evidence demonstrating that
it failed to hire plaintiff Spitsen in March 2006 because it
never received her application and because plaintiff has failed
to present any evidence indicating that this reason was merely a
pretext for unlawful discrimination, defendant's motion for
summary judgment regarding plaintiff Spitsen's claim that
defendant failed to hire her in March 2006 is GRANTED.

### 3.   Termination of Plaintiff Espinoza[12]

Plaintiff Espinoza argues that defendant DTH constructively
terminated her by failing to return her to her position or a
comparable one after her pregnancy leave.   The doctrine of
constructive discharge seeks to address the situation where,
"[i]n an attempt to avoid liability for wrongfully discharging an
employee, an employer may refrain from actually firing an
employee, preferring instead to engage in conduct causing him or
her to quit."   Colores v. Bd. of Trs., 105 Cal. App. 4th 1293,
1305 (2003) (quoting Turner v. Anheuser-Busch, Inc., 7 Cal. 4th
1238, 1244-45 (1994)).   As a result, in order to prevent "end-

---

[12]   Plaintiffs generally allege that all claims in their
complaint are asserted by all plaintiffs.   Plaintiff Espinoza's
claims are more appropriately classified as a claim for wrongful
termination in violation of FEHA.   However, the gravamen of her
claims, that she was not reinstated to her position or offered a
comparable position after her pregnancy leave, would be analyzed
similarly under a termination, retaliation, or failure to hire
theory.   As such, the court addresses all potential claims *infra*.

runs" around claims requiring employer-initiated terminations of employment, "a constructive discharge is legally regarded as a firing rather than a resignation." See id. (quoting Turner, 7 Cal. 4th at 1244-45). The standard by which a constructive discharge is determined is "whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit." Id. (quoting Turner, 7 Cal. 4th at 1248). In order to establish a constructive discharge, a plaintiff must show that "the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." Id. at 1305 (quoting Turner, 7 Cal. 4th at 1251).

Defendant argues that plaintiff cannot set forth a prima facie case under FEHA because she was not terminated, but rather, resigned for "personal reasons." Plaintiff asserts that she was not actually terminated by defendant, but constructively discharged her when they placed her in the retail position. However, defendant's alleged misconduct in failing to place her in the Spa Host position and instead allowing her to choose a position in the retail department after the Amenities Reservation Department was eliminated does not amount to constructive discharge. "[A] demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge." Turner, 7 Cal. 4th at 1247; see King v. AC & R Adver., 65 F.3d 764, 768 (9th Cir. 1995) (finding plaintiff's resignation was

unreasonable as a matter of law where the alleged "intolerable" conditions consisted of a change in his employment status to "at-will," reduction in management duties, and reduction in salary); Wagner v. Sanders Assocs., Inc., 638 F. Supp. 742, 745 (C.D. Cal. 1986) (granting summary judgment to defendant when plaintiff produced evidence only that he was transferred to a new position with less responsibility, that he stated his working conditions were satisfactory, and that he resigned in order to take a job with another employer).  Beyond the change in her position accompanied by a reduction in pay, plaintiff has failed to produce any further evidence of intolerable or aggravated working conditions.  Therefore, plaintiff's decision to resign was unreasonable as a matter of law.  See King, 65 F.3d at 767.

However, assuming *arguendo* that defendant's conduct was sufficient to set forth a claim of constructive discharge, defendant argues that it had legitimate, non-discriminatory reasons for its business decisions relating to plaintiff Espinoza's placement upon return from her pregnancy leave.  The basis for Espinoza's claim is that she was not placed in the Spa Host position, which was comparable to her previous position in Amenities Reservations.[13]  Plaintiff asserts that she saw the Spa Host position posted on the bulletin board of available positions.  (SDF ¶ 55).  Defendant contends that the Spa Host position was not available in June through August of 2004, and thus, the unavailability of the position was the legitimate, non-

---

[13]   Defendant presents evidence that Espinoza did not take an open position in Room Reservations.  (SDF ¶ 50).  However, Espinoza contends that this position was not comparable based upon the later hours required by the open position.

discriminatory reason for plaintiff Espinoza's failure to be employed as a Spa Host.  (See SDF ¶ 58).

Defendant relies upon the supplemental declaration of Daphne Haugh to support its contention that the position was unavailable.[14]  Haugh asserts that as part of her job responsibilities, she maintains records of current and former jobs at the Resort.  (Id. ¶ 2); see Butler, 210 F.3d 381; Washington Cent. R.R. Co., 830 F. Supp. at 1353 (citations omitted).  Haugh also asserts that she is familiar with the Resort's record keeping practice from April 6, 2004 to the present, and that records of available jobs are routinely made and kept in the regular course of business.  (Id.)  Such records are created near or at the time the job positions become open. (Id.)  Defendant has kept records for all job postings from June 2004 through August 2004.  (Id. ¶ 4).  A review of the records reveal that the Resort has no record of a full-time Spa Host position available between June 2004 and August 2004; only a part-time position was posted.  (Id. ¶ 4).  The records reflect that during this period there was a position open for Spa Attendant – Male, a position that required a male who could lift fifty pounds.  (Id. ¶ 6).  The job posting required a male employee because the position was for an attendant who services the men's locker room during the time the locker room is in use.

---

[14]   Defendant originally offered the declaration of Daphne Haugh, wherein she made similar assertions based upon her review of Human Resources records without first establishing that such records qualified under a hearsay exception.  However, at oral argument the court allowed defendant an opportunity to offer admissible evidence and gave plaintiff the opportunity to respond.

(Id. ¶ 6).  Therefore, defendant has proffered evidence that plaintiff Espinoza did not receive the Spa Host position because such a position was not available at the Resort from the time that she returned from her pregnancy leave until she took a position in the retail department.

Plaintiff's belief that she saw a posting for an open Spa Host position is neither specific nor substantial evidence sufficient to create a triable issue of fact regarding defendant's pretextual motive.  Plaintiff also asserts that defendant's new evidence is more complete than its previously submitted evidence, and thus, raises questions as to its credibility.  In light of this court's order that, if possible, defendant submit a more complete supplemental declaration, such assertions are without merit.  Moreover, plaintiff fails to point to any actual evidence indicating that defendant's evidence lacks trustworthiness; rather, plaintiff merely speculates that there may be potential gaps in defendant's evidence.  Such conjecture is insufficient to create a triable issue of fact.

Because plaintiff has failed to set forth a claim that she was constructively discharge, defendant has proffered evidence of legitimate, non-discriminatory reasons for its business decisions, and plaintiff had failed to present any evidence of pretext, defendant's motion for summary judgment regarding plaintiff Espinoza's FEHA claims is GRANTED.

**B.    California Family Rights Act and Family Medical Leave Act**

Plaintiff Spitsen claims that defendant DTH violated the CFRA and the FMLA by failing to reinstate her after she had

30

completed her pregnancy related leave.[15]  Plaintiff and defendant

have filed cross-motions on the issues of whether plaintiff was

an eligible employee and whether defendant is liable for

violations of the FMLA and CFRA.

The FMLA and CFRA "provide job security to employees who

must be absent from work because of their own illnesses, to care

for family members who are ill, or to care for new babies."

Bachelder v. Am. West Airlines, Inc., 259 F.3d 1112, 1119 (9th

Cir. 2001) (citing 29 U.S.C. § 2612).  "The FMLA creates two,

interrelated, substantive employee rights: first, the employee

has a right to use a certain amount of leave for protected

reasons, and second, the employee has a right to return to his or

her job or an equivalent job after using protected leave."  Id.

at 1122 (citing 29 U.S.C. §§ 2612(a), 2614(a)).  "An employer who

denies an employee these entitlements is in violation of the

FMLA."  Vanderhoof v. Life Extension Inst., 988 F. Supp. 507, 512

(D.N.J. 1997).

To survive summary judgment, an employee who claims that her

employer failed to reinstate her in violation of the FMLA and the

CFRA must make out a prima facie case that (1) she is protected

under the FMLA and the CFRA; (2) she suffered an adverse

---

[15]    The CFRA is the state counterpart to the FMLA and was
modeled on the federal statute.  See Xin Liu v. Amway Corp., 347
F.3d 1125, 1137-38 (9th Cir. 2003).  The CFRA also incorporates
FMLA regulations to the extent they do not conflict with
California law.  Cal. Admin. Code. Tit. 2, § 7297.10 (West 2007).
Cases interpreting the FMLA apply equally to CFRA claims in the
absence of a conflict.  Mora v. Chem-Tronics, 16 F. Supp. 2d
1192, 1202-03 (S.D. Cal. 1998).  Here, there is no conflict
between CFRA and FMLA law, and the parties do not distinguish
between these claims in their submissions.  Therefore, the court
applies federal FMLA law to plaintiff's CFRA claim and addresses
both claims together.

employment decision; and (3) that this adverse employment
decision was made because of her request for leave.  <u>Bocalbos v.
Nat'l W. Life Ins. Co.</u>, 162 F.3d 379, 383 (5th Cir. 1998).
Defendant contends that plaintiff was not an eligible employee
under the statutes and that any adverse employment decision was
not made because of her pregnancy leave, but for legitimate
business reasons.

### 1. Eligible Employee

The parties cross-move for summary judgment on the issue of
whether plaintiff Spitsen is an eligible employee.  Under the
FMLA, an "eligible employee" is one who has been employed "for at
least 12 months by the employer with respect to whom leave is
requested."  29 U.S.C. § 2611(2)(A)(i) (West 2007).  The term
"employer" includes "any successor in interest of an employer."
29 U.S.C. § 2611(4)(A)(ii)(II) (West 2007).  While Spitsen was
never employed by DTH, she had been employed by Benchmark from
2002 until DTH took over the Resort in 2004.  The parties
vigorously dispute whether DTH was Benchmark's successor in
interest for the purposes of liability under the FMLA and CFRA.
The implementing regulations for the FMLA provide that the
following factors should be considered in assessing whether an
employer is a "successor in interest":

> (1)  Substantial continuity of the same business operations;
> (2)  Use of the same plant;
> (3)  Continuity of the work force;
> (4)  Similarity of the jobs and working conditions;
> (5)  Similarity of supervisory personnel;
> (6)  Similarity in machinery, equipment, and production
>      methods;
> (7)  Similarity of products or services; and
> (8)  The ability of the predecessor to provide relief.

29 C.F.R. § 825.107 (West 2007).[16]  The regulations also provide that "[a] determination of whether or not a 'successor in interest' exists is not determined by the application of any single criterion, but *rather the entire circumstances are to be viewed in their totality*."  Id. (emphasis added).  In examining the factors, the court looks from the viewpoint of the plaintiff "at or near the time of the change in employer," and asks "whether an employee who has been retained will understandably view his or her job situation as essentially unaltered." Vanderhoof, 988 F. Supp. at 513 & n.2.[17]  Further, "the appropriateness of successor liability depends on whether imposition of such liability would be equitable."  Cobb v. Contract Transp., Inc., 452 F.3d 543, 554 (6th Cir. 2006) (citations omitted).  This determination of equity requires the court to balance "(1) the interests of the defendant-employer, (2) the interests of the plaintiff-employee, and (3) the goals of federal policy, in light of the particular facts of a case and the particular obligation at issue."  Id.

### a.   Continuity of the Same Business Operations

Plaintiff contends that there was substantial continuity of the business operations following the transition from Benchmark's

---

[16]    These regulatory factors may not be binding, but they provide substantial, persuasive assistance in an issue of law about which few federal courts, and none in the Ninth Circuit, have spoken.

[17]    The Vanderhoof court imported the Supreme Court's focus on the viewpoint of the employee from its analysis of successor liability in a National Labor Relations Act case, Fall River Dyeing & Finishing Corp v. NLRB, 482 U.S. 27, 43 (1987), because the relevant factors under both the FMLA and the NLRA are similar.  See Vanderhoof, 988 F. Supp. at 512-13 & n.2.  The court finds this importation persuasive.

management of the Resort to DTH's management of the Resort.  In
support of this contention plaintiff Spitsen presents undisputed
evidence that under both Benchmark and DTH's management, the
Resort maintained a 4-diamond AAA rating, which applied to hotels
and restaurants.  (DUF at 2, ¶¶ 2-3).  Under both Benchmarks and
DTH's management, the Resort had a sales and marketing
department, a rooms division, a front desk department,
restaurants, an accounting department, a spa department, guest
services, and a recreation department.  (DUF at 3, ¶ 5).  Under
DTH's management, the Resort continues to advertise to the public
as a hotel, and DTH uses Benchmark's old guest databases for its
business.  (DUF at 11-12, ¶¶ 27-28).  After DTH took over the
management of the Resort, guests could still rent a room, enjoy
the spa and fitness center, golf, eat at the restaurants, and
send their kids to children's programs offered at the Resort.
(DUF at 11, ¶ 25).  Further, when DTH took over management of the
Resort from Benchmark on April 6, 2004, it tried to make it a
seamless transition for the guests.  (DUF at 4, ¶7).

    Defendant argues that the DTH did not substantially continue
Benchmark's business operations because Benchmark managed a
conference-based hotel, while DTH converted the hotel rooms and
marketed them as condominiums to be sold to hundreds of private
owners.  (DUF at 17, ¶ 2).  As such, DTH acts as a Resort
management company as well as a rental management company.  (DUF
at 19, ¶ 7).  Eventually, DTH changed the Resort so that it no
longer qualifies as an IACC conference center.  (DUF at 22, ¶
17).

Defendant's argument that it did not substantially continue Benchmark's business operations is without merit.  It is undisputed that there was no break in the operations of the Resort on the day following the shift in management to DTH, and the Resort continued to provide the same types of services to clients.  Vanderhoof, 988 F. Supp. at 513.  Though DTH might have begun targeting different clientele, by focusing on marketing the Resort to leisure travelers rather than for conferences, and begun taking on an additional management role, by acting as both a rental management company as well as a Resort management company, DTH continued to market the Resort to the public as a hotel.  As such, the essential business operation was undisturbed.  Id.; see also Rhoads v. F.D.I.C., 956 F. Supp. 1239, 1254 (D. Md. 1997), *reversed in part on other grounds by* Rhoads v. F.D.I.C., 257 F.3d 373 (4th Cir. 2001) (finding that the government entity that took control over a private bank substantially continued the business operations because it continued to function as a financial institution despite the fact that the successor eventually sold off the mortgage servicing operation, the principal service of the predecessor).

**b.   Use of the Same Plant**

Plaintiff contends that DTH used the same plant as Benchmark.  Plaintiff presents evidence that the physical plant remained basically the same after DTH took over management of the Resort.  (DUF at 9-10, ¶¶ 20-21).  Under Benchmark's management there were 404 guest rooms, and under DTH's management, there are 405 potential guest rooms.  (DUF at 10, ¶ 22).  Under DTH's management, the Resort still maintains rentable rooms, a spa and

fitness center, a golf course, and restaurants.  (DUF at 11, ¶ 25).

Defendant argues that it does not use the "same plant" because there has been a $53,000,000 renovation to the Resort. (DUF at 17, ¶ 1).  The main lobby was remodeled and expanded, the spa/fitness center and pool areas were remodeled, the configuration and products of the restaurants and retail areas were changed, and the golf course was redesigned to make the course less difficult.  (DUF at 17, ¶ 3).  Defendant contends that most importantly, the hotel rooms were remodeled and converted to private condominiums, which could be rented to the public.  (DUF at 18-19, ¶¶ 4, 7).

Defendant's renovations were made to the same buildings and facilities that were managed by Benchmark.  The guests could continue to use the same services after the transition to DTH management.  Furthermore, the subsequent modifications and conversion to private condominiums was not immediate.  See Rhoads, 956 F. Supp. at 1253.  The Home Owners' Association, of which the condominium owners are members, was not created until July 1, 2005, over a year after the transition to DTH management. (DUF at 18, ¶ 5; Dep. of Staniskaw A. Kantowski, ("Kantowski Dep."), Ex. V to Duckworth Opp'n Decl., at 47:19-25).  Therefore, the court finds that DTH continued the operations of the Resort at substantially the same facilities which Benchmark used.

####     c.    Continuity of the Work Force

Plaintiff Spitsen asserts that the majority of Benchmark's employees were hired by DTH after the management transition. Plaintiff presents evidence that the majority of Benchmark

employees became employed by DTH.  (Dep. of John Spomer ("Spomer

Dep."), Ex. D to Decl. of Thomas E. Duckworth in Supp. of Pl.'s

1st Cross Mot. for Summ. J. ("Duckworth 1st Decl."), filed Mar.

16, 2007, at 32:7-10).  DTH also honored these employees'

original hire date with Benchmark.  (DUF at 6, ¶ 12).  Defendant

argues that not all employees were retained and there were many

changes to various positions.  However, a "minor reshuffling" of

personnel does not support a definitive conclusion that there was

no continuity in the work force.  See Carlson v. Rent-A-Center,

Inc., 237 F. Supp. 2d 114, 126 (D. Me. 2003).  Based upon

defendant's hiring of the majority of Benchmark's employees as

well as its honoring of these employees' original hire date, the

court finds that there was substantial continuity of the work

force after the management transition to DTH.

### d.   Similarity of Jobs and Working Conditions

In addressing this factor, the parties specifically address

the elimination of plaintiff Spitsen's former position as

Marketing Manager.  Plaintiff contends that the marketing

positions were merged into one at DTH.  (DUF at 15, ¶ 38).

Defendant contends that some of the duties of Marketing Manager

were distributed between the Director of Sales and Marketing and

the Marketing Coordinator positions, but other duties were

handled by outside agencies.  (DUF at 32, ¶¶ 57-58).  However,

these arguments touch upon whether plaintiff's position was

eliminated for unlawful reasons or for legitimate business

reasons and thus, go directly to the heart of plaintiff's claim

for liability.  These arguments are not helpful in the court's

1  analysis of whether, in general, under DTH's management,

2  employees at the Resort had similar jobs and working conditions.

3       In regards to the relevant inquiry, defendant hired a

4  majority of Benchmark's employees, honoring their original hire

5  date.  This raises an inference that many of the same job duties

6  were required at the Resort under DTH's management.  DTH also

7  maintained the same pay scales for hourly associates that

8  Benchmark had used.  (DUF at 9, ¶ 19).  Further, David Sullivan,

9  Benchmark's former Human Resources Director from 2000-2002 and

10 DTH's Human Resources Director in August 2005, testified that

11 structurally, in regards to the work force and departments, the

12 Resort under DTH's management was quite similar to the Resort

13 under Benchmark's management, with few exceptions.  (Dep. of

14 David Sullivan ("Sullivan Dep."), Ex. G to Duckworth 1st Decl.,

15 at 42:7-18).[18]

16      Defendant argues that the jobs and working conditions

17 greatly changed after DTH assumed management, and the Resort is

18 now managed with 22 percent fewer employees.  (DUF at 25, ¶ 28).

19 However, this reduction in workforce reflects the changes to the

20 employee structure under DTH management over time, not at the

21 time of management transition, when a majority of Benchmark's

22 employees was hired by DTH.  As such, in general, the court finds

23 that under DTH's management, the jobs and working conditions were

24 similar.  As to plaintiff Spitsen's prior position as Marketing

25 _____

26      [18]  Defendant objects to this testimony on the ground that
   it is opinion testimony which lacks foundation.  Sullivan
   testified to his lay opinion of the employment structure of the
27 Resort based upon his experience as Director of Human Resources
   at both Benchmark and DTH.  This is sufficient foundation.
28 Therefore, defendant's objection is OVERRULED.

Manager, as set forth *infra*, there are triable issues of fact relating to the elimination of this position.

### e.   Similarity of Supervisory Personnel

It is undisputed that Steve Tremewan remained the Director of Sales and Marketing after the transition of management to DTH. Defendant argues that DTH hired a new general manager, Stan Kantowski.  However, a change in upper level management is not enough to tip this factor in favor of defendant, unless "such a change in upper management has a 'substantial transformation in the basic operations' of a facility." <u>Vanderhoof</u>, 988 F. Supp. at 514 (quoting <u>United Sood & Commer. Workers Int'l Union v. NLRB</u>, 768 F.2d 1463, 1472-73 (D.C. Cir. 1985)).  As set forth above, at the relevant time period, there was not a substantial transformation in the basic operations at the Resort.

### f.   Similarity in Machinery, Equipment, and Production Methods

This prong is irrelevant in a nonmanufacturing context and will not be considered.  <u>See</u> <u>Vanderhoof</u>, 988 F. Supp. at 514.

### g.   Similarity of Products or Services

Defendant contends that the products and services offered by DTH were vastly different from those offered by Benchmark because DTH targets leisure travelers and markets the property not only as rooms for rent, but also as condominiums for sale.  However, overall, the type of services offered by the Resort remained the same.  Guests of the Resort may still rent rooms, enjoy the spa/fitness center, golf, eat at Resort restaurant, and send their kids to children's programs.  (DUF at 11, ¶ 25).  DTH sales

staff also continues to sell conventions/conferences at the
Resort.  (DUF at 12, ¶ 30).

### h.   Ability of the Predecessor to Provide Relief

This factor serves to insure that FMLA rights accrued under
one employer are compatible with work for a successor employer.
In this case, plaintiff's claim for liability is grounded in
DTH's failure to reinstate her to the position of Marketing
Manager after it took over management of the Resort.  Plaintiff
does not contend that Benchmark is liable for violations of the
FMLA.  Rather, under plaintiff's theory, her FMLA claim did not
arise until after DTH took over management of the Resort and
eliminated her position.  "Where, as in this case, the plaintiff
had no FMLA claim against the former employer, the ability of the
predecessor to provide relief is irrelevant." Rhoads v.
F.D.I.C., 956 F. Supp. 1239, 1254 (D. Md. 1997), *reversed in part
on other grounds by* Rhoads v. F.D.I.C., 257 F.3d 373 (4th Cir.
2001).

### i.   Merger or Asset Acquisition

Defendant argues that the absence of a merger or asset
acquisition by DTH weighs against the finding of successor
liability.  While the existence of a merger or asset acquisition
is not listed as a factor in the implementing regulations for the
FMLA, courts have considered it a factor in the assessment of
whether an employer is a successor in interest. See Cobb, 452
F.3d at 555-56 (finding that a merger or transfer of assets is
not a precondition to successor liability under the FMLA, but an
appropriate factor for consideration).  In this case, it is

undisputed that there was not merger or asset acquisition by

defendant DTH when it took over management of the Resort.

### j.   Balance of the Equities

A balance of the equities in light of the policies embodied

in the FMLA and the CFRA weighs in favor of holding that

defendant DTH is a successor in interest to Benchmark for the

purpose of imposing the statutory requirement of reinstating

plaintiff to the same or an equivalent position after her

pregnancy related leave.   The broad purposes of the FMLA are:

> (1)   to balance the demands of the workplace with the
> needs of families, to promote the stability and
> economic security of families, and to promote
> national interests in preserving family integrity;
> (2)   to entitle employees to take reasonable leave to
> medical reasons, for the birth or adoption of a
> child, and for the care of a child, spouse, or
> parent who has a serious health condition;
> (3)   to accomplish the purposes described in paragraphs
> (1) and (2) in a manner the accommodates the
> legitimate interests of employers.
> (4)   to accomplish the purposes described in
> paragraphs(1) and (2) in a manner that . . .
> minimizes the potential for employment
> discrimination on the basis of sex . . . ; and
> (5)   to promote the goal of equal employment
> opportunity for women and men . . . .

29 U.S.C. § 2601 (West 2007).   The FMLA is a remedial statute,

through which Congress sought to address important social issues

such as the lack of accommodating employment policies, inadequate

job security, the disproportionate responsibility of women in

taking care of the family, and employment standards that apply to

only one gender and thus, create a serious potential for

discrimination.   <u>Id.</u>   "Following traditional canons of statutory

interpretation, remedial statutes should be construed broadly to

extend coverage."   <u>Cobb</u>, 452 F.3d at 559; <u>see</u> <u>Lambert v. Ackerly</u>,

180 F.3d 997, 1003 (9th Cir. 1999) (holding that the FLSA, which

1  is remedial and humanitarian in purpose, "must not be interpreted

2  or applied in a narrow, grudging manner") (citations and

3  quotations omitted).

4       As set forth above, the court's analysis of the successor in

5  interest factors demonstrates that the facts of this case weigh

6  in favor of the finding that defendant DTH is a successor in

7  interest to Benchmark.  Looking at the totality of the

8  circumstances, plaintiff Spitsen, at or near the time of the

9  change in employer," could understandably have viewed her job

10 situation as essentially unaltered, absent the contested

11 elimination of her position.  See Vanderhoof, 988 F. Supp. at 513

12 & n.2; see infra Section C.2.-C.3.  Moreover, in light of the

13 broad statutory interpretation that should be applied to the

14 FMLA, the designation of DTH as a successor in interest and thus,

15 plaintiff as an "eligible employee" is in keeping with the FMLA

16 and CFRA's broad remedial purposes.[19]

17      Therefore, plaintiff's First Cross Motion for Partial

18 Summary Judgment on the issue of whether plaintiff Spitsen is an

19

20 _____

21 [19]     As noted above in the court's analysis of whether DTH
   was an employer for purposes of FEHA, the circumstances presented
22 in plaintiff Spitsen's claims for termination and retaliation in
   violation of FEHA are distinguishable from those presented in her
23 claims for defendant's violations of the FMLA and CFRA.  While
   the court envisions that, in most circumstances, the inquiry of
24 whether an employer is a successor in interest would likely be
   the same under FEHA, the FMLA, and the CFRA, this case is an
25 exception because of the unusual fact that plaintiff's claims
   arose out of a management transition that occurred while she was
26 on a pregnancy related leave.  While FEHA carves out a specific
   cause of action for an employer's unlawful failure to hire, the
27 FMLA and CFRA do not.  However, it is abundantly apparent to the
   court that given the broad remedial purposes of these statutes,
28 the FMLA and CFRA were intended to address the type of situation
   presented by plaintiff Spitsen in this case.

eligible employee under the FMLA and CFRA is GRANTED, and
defendant's motion for summary judgment on this issue is DENIED.

**2.   Failure to Hire Plaintiff Spitsen as Marketing Manager**

The parties also cross-move for summary judgment on the
issue of whether DTH is liable for a violation of the FMLA or
CFRA.  Defendant argues that the decision not to hire plaintiff
Spitsen as Marketing Manager was not related to her pregnancy
leave, but because her position was eliminated as unnecessary.

The Ninth Circuit has explicitly held that the <u>McDonnell
Douglas</u> burden shifting approach does not apply to interference
claims under the FMLA, and that all a plaintiff must demonstrate
in order to set forth a violation of the FMLA is that "her taking
of FMLA-protected leave constituted a negative factor in the
decision to terminate her."  <u>Bachelder</u>, 259 F.3d at 1125; <u>Faust
v. California Portland Cement Co</u>, 2007 WL 1365776 (May 10, 2007)
(CFRA).[20]  The plaintiff can prove this claim by using either
direct or circumstantial evidence, or both.  <u>Id.</u> (citations
omitted).  However, the implementing regulations of the FMLA
provide that "[a]n employee has no greater right to reinstatement
. . . than if the employee had been continuously employed during
the FMLA period."  29 C.F.R. § 825.216 (West 2007).  "An employer
must be able to show that an employee would not otherwise have

---

[20]   Defendant argues that plaintiffs' claims are
discrimination and retaliation claims, for which neither the
Ninth Circuit nor California courts have affirmatively decided
the analysis to apply.  The court construes plaintiffs' claims as
interference claims and thus, does not apply the <u>McDonnell
Douglas</u> burden-shifting analysis.  However, to the extent such an
analysis would apply, the court incorporates its discussion of
plaintiffs' claims under FEHA as set forth *supra*.

1 been employed at the time reinstatement is requested in order to

2 deny restoration to employment." Id.

3      While no burden shifting approach applies to these claims,

4 the court's analysis of plaintiff Spitsen's and defendant DTH's

5 evidence, as set forth in its analysis of plaintiff's FEHA claim,

6 is relevant to whether there is a triable issue of fact regarding

7 whether defendant used plaintiff's FMLA-protected leave as a

8 negative factor in the decision to terminate her.  Defendant has

9 presented evidence that its failure to hire plaintiff as

10 Marketing Manager resulted from its decision to eliminate the

11 position to "structurally optimize" the marketing department at

12 the Resort.  However, plaintiff has presented evidence indicating

13 that her pregnancy leave was a negative factor in DTH's decision

14 not to employ her, including evidence that the only employees at

15 her manager-level that were not re-hired by DTH (who had not

16 resigned prior to the extension of offers) were two women who had

17 taken pregnancy leaves.  Based upon the evidence presented by the

18 parties, there is a triable issue of fact regarding whether

19 defendant violated the FMLA and CFRA by not re-hiring plaintiff

20 Spitsen as Marketing Manager.  See Donahoo v. Master Data Ctr.,

21 282 F. Supp. 2d 540, 553-54 (E.D. Mich. 2003) (holding that

22 motion for summary judgment was inappropriate where there were

23 questions of fact regarding defendant's true motivation for

24 eliminating plaintiff's position).  As such, both plaintiff's and

25 defendant's motion for summary judgment on this issue is DENIED.

26 /////

27 /////

28 /////

### 3. Failure to Hire Plaintiff Spitsen as Marketing Coordinator

Alternatively, plaintiff Spitsen contends that she should have been reinstated to the comparable position of Marketing Coordinator after Krieger left the position in August 2004. Defendant argues that the position of Marketing Coordinator was not a comparable position to that of Marketing Manager, and therefore, it was under no duty to offer that position to plaintiff.

The FMLA provides that after taking a protected leave, an eligible employee shall be "restored to an equivalent position with *equivalent employment benefits, pay, and other terms and conditions of employment*." 29 U.S.C. § 2614(a)(1)(B) (West 2007) (emphasis added). The implementing regulations of the FMLA provide that

> [a]n equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, prerequisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.

29 C.F.R. § 825.215(a) (West 2007). Under the CFRA, "employment in the same or comparable position" is similarly defined as "employment in a position that has *the same or similar duties and pay* . . . ." Cal. Gov't Code § 12945.2(4) (West 2007) (emphasis added).

It is undisputed that the Marketing Coordinator position paid approximately $10,000 less per year than the Marketing

45

Manager position.  (DUF at 31, ¶ 56).[21]  It is also undisputed

that the Marketing Coordinator was not a supervisory position,

unlike the Marketing Manager position.  (Id.)  Spitsen herself

testified that at the time Krieger was promoted to the position,

she viewed the Marketing Coordinator position as lower than

Marketing Manager position.  Further, it is undisputed that under

DTH, the Marketing Coordinator did not create marketing and

advertising, a function previously performed by the Marketing

Manager under Benchmark.  (DUF at 32, ¶ 57).  As such, the

Marketing Coordinator position was not an equivalent or

comparable position to the Marketing Manager position because of

the difference in compensation, responsibility, authority,

duties, and status.  Therefore, defendant DTH did not violate the

FMLA or CFRA by failing to reinstate plaintiff to this

position.[22]  As such, defendant's motion for summary judgment

regarding whether defendant was required under the FMLA or CFRA

to reinstate plaintiff Spitsen to the position of Marketing

Coordinator is GRANTED, and plaintiff's cross-motion for summary

judgment on this issue is DENIED.

/////

_____

[21]   Plaintiffs did not dispute facts relating to the
Marketing Coordinator position, but rather stated that they were
"immaterial" to the court's inquiry into successor liability.
Further, plaintiffs failed to cite to any evidence which would
place these facts in dispute.  See Local R. 56-260(b).

[22]   In fact, because the position was not equivalent,
defendant's attempt to reinstate plaintiff to this position may
have given rise to a separate violation of the FMLA and CFRA.
Under plaintiff's argument, defendant could be held liable not
only for restoring plaintiff to a position that was not
equivalent, but also for not attempting to restore plaintiff to
that same position.

46

1      **4.    Termination of Plaintiff Espinoza**

2          Plaintiff Espinoza claims that she was terminated in

3  violation of the CFRA.  For the reasons set forth above in the

4  court's discussion of plaintiff Espinoza's FEHA claims, plaintiff

5  has failed to raise a triable issue of fact that she was

6  constructively discharged by defendant.  Further, defendant

7  presented evidence of legitimate, non-discriminatory reasons for

8  its business decisions, and plaintiff has not presented evidence

9  indicating that her pregnancy leave was a negative factor in

10  DTH's decisions.  Therefore, defendant's motion for summary

11  judgment regarding plaintiff Espinoza's CFRA claim is GRANTED.

12  **C.  Wrongful Termination in Violation of Public Policy**

13          Plaintiff Espinoza also asserts a common law state tort

14  claim against defendant DTH for wrongful termination in violation

15  of public policy.  Defendant argues that this claim should fail

16  because plaintiff Espinoza's claims under FEHA and the CFRA fail.

17  To prove wrongful discharge in violation of public policy, a

18  plaintiff must prove (1) an employer-employee relationship; (2)

19  the termination of plaintiff's employment was a violation of

20  public policy; (3) the termination was a legal cause of

21  plaintiff's damage; and (4) the nature and extent of plaintiff's

22  damage.  <u>Holmes v. Gen. Dynamics Corp.</u>, 17 Cal. App. 4th 1418,

23  1427 n.8 (1993).

24          Plaintiff Espinoza premises her wrongful termination claim

25  on the theory that her termination violated public policy because

26  it was in violation of FEHA and the CFRA.  <u>See</u> <u>Stevenson v.</u>

27  <u>Superior Court</u>, 16 Cal. 4th 880, 897 (1997) (holding that "FEHA's

28  policy against discrimination in employment is sufficiently

47

1  substantial and fundamental to support a tort claim for wrongful

2  discharge"). Because plaintiff Espinoza's FEHA and CFRA claims

3  fail, her corollary claim for wrongful termination in violation

4  of public policy also fails. Therefore, defendant DTH's motion

5  for summary judgment regarding plaintiff Espinoza's claims for

6  wrongful termination in violation of public policy is GRANTED.

7  **D.   Retaliation/Interference in Violation of Public Policy**

8         Plaintiff Spitsen brings a claim for retaliation and

9  interference in violation of public policy based upon DTH's

10 alleged violations of FEHA and the CFRA.[23] This claim is based

11 upon defendant DTH's failure to employ plaintiff Spitsen after

12 her pregnancy related leave. As set forth above, plaintiff has

13 shown that there are triable issues of fact regarding her claims

14 of failure to hire in violation of FEHA and of failure to

15 reinstate her in violation of the CFRA. As such, there are

16 triable issues of fact regarding defendant's liability under

17 plaintiff's claim of retaliation and interference in violation of

18 public policy. Therefore, defendant's motion for summary

19 judgment on this issue is DENIED.

20 **E.   Unfair or Unlawful Business Practice**

21        Plaintiffs contend that defendant DTH engaged in unfair and

22 unlawful business practices based upon its alleged violations of

23 FEHA, CFRA, and FMLA. Defendant argues that this claim should

24

25        [23]   Plaintiff Espinoza also brings a claim for retaliation
   in violation of public policy based upon defendant's alleged FEHA
26 and CFRA violations. As set forth above, Espinoza's claims are
   more appropriately characterized as a termination claim.
27 However, because plaintiff's FEHA and CFRA claims fail,
   plaintiff's tort claim for retaliation similarly fails, and
28 defendant's motion for summary judgment is GRANTED.

1  fail because plaintiffs' underlying claims should fail.  Because

2  plaintiff Espinoza has failed to demonstrate a triable issue of

3  fact as to her FEHA and CFRA claims, she has also failed to raise

4  a triable issue of fact as to her unfair and unlawful business

5  practices claim.  Therefore, defendant's motion for summary

6  judgment regarding plaintiff Espinoza's claim is GRANTED.

7  However, plaintiff Spitsen has raised triable issues of fact

8  regarding her FEHA, FMLA, and CFRA claims.  As such, defendant's

9  motion for summary judgment regarding plaintiff Spitsen's claim

10  is DENIED.

11                          **CONCLUSION**

12      Based on the foregoing analysis, the court makes the

13  following orders:

14  A.   As to the claims brought by plaintiff Amanda Spitsen:

15       1.   Defendant's Motion for Summary Judgment regarding

16            plaintiff's claim for Termination in violation of FEHA

17            is GRANTED.

18       2.   Defendant's Motion for Summary Judgment regarding

19            plaintiff's claim for Wrongful Termination in violation

20            of public policy is GRANTED.

21       3.   Defendant's Motion for Summary Judgment regarding

22            plaintiff's claim for Retaliation in violation of FEHA

23            is GRANTED.

24       4.   Defendant's Motion for Summary Judgment regarding

25            plaintiff's claim for Failure to Hire her in April 2004

26            in violation of FEHA is DENIED.

27

28

1     5.    Defendant's Motion for Summary Judgment regarding
2           plaintiff's claim for Failure to Hire her in March 2006
3           in violation of FEHA is GRANTED.

4     6.    Plaintiff Spitsen's First Cross-Motion for Partial
5           Summary Judgment on the issue of whether plaintiff is
6           an "eligible employee" under the FMLA and CFRA is
7           GRANTED.

8     7.    Plaintiff Spitsen's Second Cross-Motion for Partial
9           Summary Judgment regarding defendant's liability for
10         violations of the FMLA and CFRA is DENIED.

11    8.    Defendant's Motion for Summary Judgment regarding
12         plaintiff's claims for violations of the FMLA and CFRA
13         arising out defendant's failure to hire her as
14         Marketing Manager is DENIED.

15    9.    Defendant's Motion for Summary Judgment regarding
16         plaintiff's claims for violations of the FMLA and CFRA
17         arising out defendant's failure to hire her as
18         Marketing Coordinator is GRANTED.

19    10.   Defendant's Motion for Summary Judgment regarding
20         plaintiff's claim for Retaliation/Interference in
21         violation of public policy is DENIED.

22    11.   Defendant's Motion for Summary Judgment regarding
23         plaintiff's claim for Unfair or Unlawful Business
24         Practice is DENIED.

25  /////
26  /////
27  /////
28  /////

1  B.    As to the claims brought by plaintiff Amelia Espinoza,

2         defendant's Motion for Summary Judgment is GRANTED.

3         IT IS SO ORDERED.

4  DATED: June 1, 2007

5

6

7                                              _____

8                          FRANK C. DARRELL, JR.
                           UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28